IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PAUL KROKUS, JR., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL J. ASTRUE, )<br>COMMISSIONER OF SOCIAL )<br>SECURITY, )<br>)<br>Defendant. ) | 2:08cv1291<br>**Electronic Filing** |

**MEMORANDUM OPINION**

March 30, 2010

**I.     INTRODUCTION**

Plaintiff, Paul Krokus, Jr. ("Krokus" or "plaintiff"), brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking review of the final determination of the Commissioner of Social Security ("Commissioner" or "defendant") denying plaintiff's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), as amended, 42 U.S.C. §§ 401-433 and 42 U.S.C. §§ 1381-1383(f).

**II.    PROCEDURAL HISTORY**

Krokus filed an application for SSI benefits on May 30, 2006, and for DIB benefits on June 8, 2006, alleging disability since July 12, 2004, due to right arm, jaw and pelvis pain, post traumatic stress disorder, and seizures. (R. 95-99; 100-102; 117; 126). Krokus' claims were initially denied.[1] (R. 65-74). A hearing was held on November 6, 2007, in Morgantown, West Virginia, before Administrative Law Judge Norma Cannon ("ALJ"). (R. 27-60). Krokus was represented by counsel, Gregory T. Kunkel, and appeared and testified. (*Id.*). An impartial vocational expert ("VE"), was also present and gave testimony. (*Id.*). The ALJ issued an

---

[1]This case was randomly selected by the Commissioner to test modifications to the disability determination process, so the reconsideration step of the administrative review process was eliminated and the case was escalated to the hearing level (R.67); *see* 20 C.F.R. § 404.906(a) (2008).

unfavorable decision on January 9, 2007, finding that Krokus was "not disabled" within the meaning of the Social Security Act.[2] (R. 11-23). The ALJ's decision became the Commissioner's final decision when, on July 25, 2008, the Appeals Council denied Krokus' request for review. (R. 1-5). Administrative remedies thus being exhausted, plaintiff brings the instant matter before this court, seeking judicial review of the Commissioner's decision. The parties have filed cross motions for summary judgment together with supporting briefs under Rule 56 of the Federal Rules of Civil Procedure, and the record has been developed at the administrative level. The matter is now poised for disposition.

### III.   STATEMENT OF THE CASE

Krokus was born on August 6, 1975, making him twenty-eight (28) years old at the onset of the alleged disability and thirty-two (32) years old on the date of the administrative hearing. (R. 95; 34). Under the Commissioner's regulations, applicants under the age of 50 are considered "younger individuals" and their age is not considered a significant impediment to adapting to new work situations. 20 C.F.R. § 416.963.

Krokus graduated from college, and earned a degree in nursing. (R. 33; 118; 124). His employment history consists of work as a registered nurse for the Navy from September 1997 until July 12, 2004, the alleged disability onset date. (R. 33-34; 37; 118). Krokus surrendered his nursing license because he believed he was incapable of competently discharging his duties after the trauma of his daughter's death of SIDS at six months of age. (R. 33-34). During high school and college, he was self-employed in a lawn maintenance enterprise. (R. 38-39).

In October 2002, Krokus' jaw became infected resulting from a tooth extraction. (R. 169-80). Krokus was diagnosed with left mandibular osteomyelitis and endured several surgical

---

[2]An individual is considered to be "disabled" if he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also* 42 U.S.C. § 423(d)(1)(A)(using almost identical language).

interventions, including the extraction of additional teeth, the implantation of a reconstruction plate, and oral maxillofacial surgery, while still in the Navy. (*Id.*). On March 9, 2005, Krokus withstood a posterior iliac bone graft procedure in which bone was harvested from his right pelvis and grafted on to the left jaw. (R. 377-79).

An MRI was conducted on Krokus' right knee on June 9, 2005, revealing a tear of the posterior horn of the medial meniscus. (R. 350). Krokus endured a right knee arthroscopy and partial medial meniscectomy and chondroplasty of medial femoral condyle on July 6, 2005. (R 439-40; 562-63).

Krokus was treated in Greene County Memorial Hospital on August 18, 2005, for acute abdominal pain with chronic diarrhea. (R. 534-51). CT scans of the abdomen and pelvis were normal, and Krokus was discharged with diagnoses of mild diverticulosis, post traumatic stress disorder, chronic jaw pain, and gastroesophageal reflux disease. (R. 352; 534).

CT scans were conducted on Krokus' head on February 21, 2005, October 29, 2005, and May 26, 2006, all revealing normal findings. (R. 224; 308; 347). Radiology performed on December 11, 2005, indicated Krokus' pelvic structures were within normal limits. (R. 217). Radiology of Krokus' right wrist on January 19, 2007, showed no fracture or dislocation. (R. 486).

Krokus suffered a poisonous spider bite on his right forearm in the Spring of 2006. (R. 714). Afterwards, he reported weakness and tingling. (R. 710). Krokus was treated by David R. Sheba, D.O., ("Dr. Sheba"), following an irrigation and debridement of his right forearm. (R. 364-66). On April 28, 2006, the numbness and tingling were improving but he was still experiencing pain and pressure. (R. 366). Krokus began taking occupational therapy. (*Id.*). On May 12, 2006, Krokus was complaining of a burning sensation in his hand. (R. 365). Dr. Sheba noted limited range of motion of the wrist and fingers. (*Id.*). Dr. Sheba prescribed vicodin for Krokus' pain. (364-65).

On May 22, 2006, Krokus was found unresponsive with two fentanyl patches attached to his person and was transported to the West Virginia University Hospital emergency department. (R. 292). On February 1, 2007, Krokus overdosed twice in a 24 hour period on a combination of

oxycodone and fentanyl. (R. 499-504).

On February 12, 2007, Christopher C. Schmidt, M.D., ("Dr. Schmidt"), performed right median nerve neurolysis and right ulnar nerve neurolysis to Krokus' wrist, as well as a right vascularized pedicle, hyperthenar fat pad flap to the median nerve. (R. 487-88). Postoperative diagnoses were right median and right ulnar nerve neuropathy. (R. 487).

Krokus was treated at the emergency department of Uniontown Hospital on March 29, 2007, for an accidental overdose of fentanyl and vicodin. (R. 509-10). On June 16, 2007, Krokus was found injecting OxyContin into his vein and he was taken to the emergency department at Uniontown Hospital to ensure his safety. (R. 513).

Heather Vega, D.O., ("Dr. Vega"), has been Krokus' primary care physician since July 21, 2006. (R. 693-719). Dr. Vega completed a medical questionnaire to determine Krokus' physical capacities on October 29, 2007. (R. 725-28). Dr. Vega's conclusions indicated that Krokus could sit, stand, or walk, less than one hour each during an eight hour workday. (R. 725). Dr. Vega found that Krokus could not bend, climb, balance, or crouch, but could perform limited stooping crawling, and kneeling. (R. 726). Dr. Vega determined that Krokus could frequently lift up to twenty pounds, and occasionally lift 21-25 pounds. (*Id.*). Dr. Vega found that Krokus could not use his right hand for simple grasping or fine manipulations, and that he has loss of grip strength and numbness in his right hand. (R. 727). Dr. Vega concluded that Krokus required complete freedom to rest frequently throughout the day and that it was necessary for him to lie down or sit on a recliner for a substantial period of time throughout the day. (*Id.*). Dr. Vega indicated that Krokus' condition is permanent. (*Id.*). Dr. Vega attributed these limitations to Krokus' pelvic resection for grafting to reconstruct the left mandible, resulting in chronic pain in the left pelvic region, damage to his right forearm from a brown recluse spider bite, including nerve damage, and chronic headaches. (R. 728).

Krokus underwent treatment at Chestnut Ridge Counseling Services, Inc., and was evaluated by Allison Sastry, M.D., ("Dr. Sastry"), on June 4, 2007. (R. 518-21). Dr. Sastry reported that Krokus was initially diagnosed with bipolar disorder in 2001 while in the Navy. (R. 518). Dr. Sastry noted Krokus' chief complaint to be that he has not been able to overcome his

grief from his six month old daughter's death from SIDS in December 2000, that he is depressed, that he is always anxious, and has panic attacks. (R. 518-19). Dr. Sastry noted that Krokus adamantly denied any suicidal ideation. (R. 518). Krokus reported to Dr. Sastry that he has approximately three panic attacks per week mainly related to a calculus course he was taking at West Virginia University in pursuit of an engineering degree. (R. 519).

Dr. Sastry diagnosed major depressive disorder, moderate, recurrent, rule-out bipolar disorder type II by history, panic disorder, and post traumatic stress disorder and assessed a global assessment of functioning ("GAF") of 55.[3] (R. 520-21). Krokus was given a crisis number and was prescribed an increase in Lamictal, continuation of his Klonopin, and a decrease in his Paxil to be discontinued and gradually replaced with Cymbalta. (R. 521). Dr. Sastry related to Krokus that she was leaving the agency and a new M.D. would be assigned to his case. (*Id.*). A therapy referral was to be completed. (*Id.*).

Dr. Sastry completed a mental impairment questionnaire concerning Krokus' impairments on October 16, 2007. (R. 720-24). Dr. Sastry indicated that she met with Krokus monthly for sessions lasting between half an hour and an hour, and that Krokus suffered from post traumatic stress disorder, major depression, and an anxiety disorder. (R. 720). Dr. Sastry identified Krokus' signs and symptoms as poor memory, sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, anhedonia or pervasive loss of interests, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, intrusive recollection of a traumatic experience, and generalized persistent anxiety. (*Id.*). Dr. Sastry evaluated Krokus' functional limitations and noted slight restriction of activities of daily living, moderate difficulties in maintaining social functioning, often having deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner, and continual

---

[3]The GAF scale, designed by the American Psychiatric Association, ranges from zero to one hundred and assesses a person's psychological, social and occupational function. *Diagnostic and Statistical Manual of Mental Disorders*, (DSM-IV-R) (4th ed. 2000). A score between 51 and 60 indicates some moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g. few friends, conflicts with peers or co-workers). *Id.*

episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms. (R. 721).

Dr. Sastry further assessed Krokus' ability to do work-related activities and found that he had a fair ability to follow work rules, use judgment, relate to co-workers, interact with supervisors, and function independently, but he was seriously limited in his ability to deal with the public, deal with work stresses, and maintain attention or concentration. (R. 722). Dr. Sastry rated Krokus' ability to understand, remember, and carry out simple job instructions as good, and his ability to understand, remember, and carry out detailed and complex job instructions as fair. (R. 723). Dr. Sastry indicated that Krokus had a fair ability to maintain personal appearance and demonstrate reliability, but that he was seriously limited in his ability to behave in an emotionally stable manner and relate predictably in a social situation. (*Id.*). Dr. Sastry attributed these limitations to Krokus' post traumatic stress disorder and anxiety, which can cause rushing thoughts, inability to control his emotions, nausea and vomiting, crying spells, and social seclusion. (R. 724).

At the time of the hearing, Krokus was living with his parents and drove approximately 80 miles per week. (R. 34). He had been on indefinite leave without pay from the Navy since July 12, 2004. (R. 35). Krokus was enrolled at West Virginia University pursuing an engineering degree, but had not yet successfully completed a full semester. (R. 49).

On a typical day, Krokus will wake up at 9:00 a.m. to take his medications, and then will go back to sleep until around lunchtime. (R. 39). He is able to shower and shave, and make his bed without resting. (R. 39; 133). Krokus vacuums his basement where he stays, and helps out with the cooking and cleaning. (R. 39-40; 131).

When his other daughter visits him, Krokus engages in activities with her, including going to the movies and playing miniature golf. (R. 41-42). Krokus also watches television, and occasionally takes a walk around the block. (R. 41-42). He is able to start and complete projects, such as reading a book or building a puzzle, and occasionally visits with friends or socializes at the American Legion. (R. 40-41; 134).

At the administrative hearing, the testimony of the VE indicated that a hypothetical individual sharing plaintiff's vocational characteristics and limited to medium work needing to avoid hazards, no climbing ladders, ropes, or scaffolds, no frequent overhead lifting, slight reduction in grip strength, sit/stand option, must be permitted to use a cane to ambulate, and limited to entry-level positions, working with things as opposed to people, and limited public contact could perform work existing in the national economy as a dining room attendant, kitchen helper, or an equipment cleaner.[4] (R. 55-56). The VE also indicated that the hypothetical person could perform jobs in the light work category subject to the same restrictions of storage facility counter clerk, mail clerk, non Postal Service, or a sewing machine operator. (R. 56-57). At the sedentary level the VE identified the representative occupations of document preparer, table worker, and surveillance system monitor. (R. 57). The VE testified that employers will normally tolerate absences up to two days per month for entry-level jobs. (R. 58). Upon questioning by Krokus' counsel the VE testified that a hypothetical individual limited to the extent identified by Dr. Vega on the medical questionnaire would not be able to find work available in the national economy. (R. 59). Additionally, the VE testified that, assuming the limitations identified by Dr. Sastry on the mental impairment questionnaire, no work would be available to such an individual. (*Id.*).

The ALJ issued a decision unfavorable to Krokus on January 9, 2008.[5] (R. 11-23). After determining that Krokus met the insured status requirements of the Social Security Act through September 30, 2009 and has not engaged in substantial gainful activity since his alleged disability onset date, the ALJ acknowledged that Krokus has the severe impairments of a history of jaw surgery, pain syndrome, a torn meniscus, major depressive disorder, panic disorder, post

---

[4] For purposes of the Act, work "exists in the national economy" if it "exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). "The ALJ must show that there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and residual functional capacity." *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).

[5] The decision is erroneously dated January 9, 2007.

traumatic stress disorder, and a history of polysubstance abuse including alcohol abuse. (R. 13). The ALJ then found that Krokus did not have an impairment or combination of impairments that met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (R. 18).  The ALJ determined that Krokus maintained the residual functional capacity ("RFC")[6] to engage in work activity at the light level subject to certain modifications allowing for his physical and mental limitations. (R. 20-22).  Ultimately, the ALJ concluded that a significant number of jobs existed in the national economy that Krokus could perform, considering his age, education, work experience, and RFC, and therefore Krokus was not disabled within the meaning of the Act at any time relevant to the rendering of the ALJ's decision. (R. 22-23).

## IV.   STANDARD OF REVIEW

This court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).  The court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).  Congress has expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).  As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

---

[6] Residual functional capacity is "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health and Human Services*, 841 F.2d 57, 59 (3d Cir. 1988) (quoting *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987)); 42 U.S.C. § 423(d)(1).  A claimant is considered to be unable to engage in substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).  To support his ultimate findings, an ALJ must do more than state factual conclusions.  He must make specific findings of fact. *Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir. 1983).  The ALJ must consider all medical evidence contained in the record and must provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its rulemaking authority under 42 U.S.C. § 405(a), has developed a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act.  The United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 CFR] §§ 404.1520(b), 416.920(b).  At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c).  At step three, the agency determined whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d).  If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimants age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§404.1520(f),

404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003)(footnotes omitted).

## V.   DISCUSSION

Here the ALJ determined that plaintiff was not disabled within the meaning of the Act at the fifth step because she found that plaintiff was capable of performing a range of light work existing in significant numbers in the national economy. The light work category is described in the regulations as follows:

> (b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm and leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567.

The ALJ further narrowed plaintiff's ability to perform light work by assessing an RFC limiting him to no exposure to workplace hazards such as unprotected heights, or dangerous moving machinery, no climbing of ladders, ropes or scaffolds, no more than occasional postural movements, a slight reduction in hand grip strength, a sit/stand option, the ability to use a cane for ambulation, no frequent lifting overhead, no more than entry-level work, routine and repetitive tasks, working with things rather than people, and no work that requires more than limited contact with the general public. (R. 20). Based upon the limitations described by the ALJ, the VE was able to identify representative occupations in the light and sedentary work categories that plaintiff could perform.

Plaintiff's first challenge to the sufficiency of the ALJ's decision is that the ALJ failed to afford controlling weight to the opinions of plaintiff's treating physicians. Specifically, plaintiff argues, the ALJ should have credited the limitations identified by Dr. Vega and Dr. Sastry on the medical questionnaire forms submitted to the record.

It is true, as plaintiff points out, "[a] cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 ((3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)); *see also Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987). Where the opinion of a treating physician conflicts with that of a non-treating physician, "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Morales*, 225 F.3d at 317 (quoting *Plummer*, 186 F.3d at 429). When choosing to reject a treating physician's opinion, "an ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (quoting *Plummer*, 186 F.3d at 429). Where there is conflicting evidence, the ALJ must not only discuss evidence that supports his or her determination, but also explain the evidence that he or she rejects. *Cotter*, 642 F.2d at 705 (citing *Dobrowolsky*, 606 F.2d 403); *see also Wisniewski v. Comm'r of Soc. Sec.*, 210 Fed.Appx. 177 (3d Cir. 2006) (clarifying *Cotter*).

  In this case the ALJ rejected the extreme limitations found by Dr. Vega and Dr. Sastry as noted on the medical questionnaire forms the doctors completed because the opinions expressed therein are not supported by their earlier findings or by the objective medical evidence considered as a whole. The ALJ found that plaintiff's attendance of classes at West Virginia University contradicted the limitations found by Dr. Vega, including the finding that plaintiff could sit, stand, and walk less than one hour each during an eight hour workday. The ALJ rejected the limitations found by Dr. Sastry because her opinion failed to indicate plaintiff's abilities absent his polysubstance abuse. The ALJ, therefore, accorded less weight to these opinions.

  With respect to the opinion of Dr. Vega, while plaintiff argues that the ALJ improperly dismissed her opinion, he points to no evidence of record that supports the extreme limitations found by Dr. Vega, in her own treatment of plaintiff, or in the other medical evidence contained

11

in the record. Furthermore, Dr. Vega's opinion is expressed as a check–the-box type of evaluation and is not supported by any objective medical evidence or medically acceptable clinical and laboratory diagnostic techniques. While it is true that "[u]nder applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight," *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)), an ALJ "may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." *Plummer v. Apfel*, 486 F.3d 422, 429 (3d Cir. 1999) (citing *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985)). Additionally, plaintiff fails to recognize that these types of check-the-box reports, even when completed by a primary care physician, are entitled to less evidentiary weight than other substantive medical evidence. "Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993). Furthermore, a treating physician's opinion that a claimant is "disabled" or "unable to work" is not dispositive or entitled to special deference. See *Adorno v. Shalala*, 40 F.3d 43, 47-48 (3d Cir. 1994); 20 CFR §§ 404.1527(e), 416.927(e). Disability determinations are the province of the ALJ. 20 CFR § 404.1527(d)(2), 416.927(d)(2). Similarly, the ultimate determination of a claimant's RFC is a responsibility reserved to the ALJ. *See* 20 C.F.R. §§ 404.1527(e)(2), 404.1546, 416.927(e)(2), 416.946.

    Plaintiff argues that it was improper for the ALJ to reject Dr. Sastry's opinion based on her ignorance of plaintiff's polysubstance abuse. Plaintiff offers that the alleged drug overdoses were more likely failed suicide attempts, further bolstering plaintiff's claim of disabling depression. This claim, however, overlooks plaintiff's testimony that "they thought I was trying to kill myself but I was just taking Oxycodone to kill the pain. And they found me lethargic and took me to the hospital." (R. 51). Additionally, the treatment notes from his overdose on May 22, 2006, reveal that plaintiff denied that it was a suicide attempt, or that plaintiff has suicidal ideation. (R. 302). The treatment notes from his March 29, 2007, overdose state: "The patient says he did not try to hurt himself. He just accidentally took too much. He is not suicidal or homicidal." (R. 509). It is further contradicted by plaintiff's statements to Dr. Sastry during the

initial evaluation in which plaintiff adamantly denied suicidal ideation because he had to be around for his then 7-year-old daughter, and that she was the "joy of his life." (R. 518). Furthermore, despite plaintiff's characterization of the ALJ's "polysubstance abuse theory" being based on a single stray remark from an emergency room physician, the longitudinal record contains multitudinous references to plaintiff's substance abuse.  In addition to his multiple drug overdoses, it was recommended that he undergo an addiction medicine evaluation on August 7, 2002, while he was still on active duty in the Navy. (R. 617).  During an admission in the Naval Medical Center later in 2002, it was noted that plaintiff "denies any other drug use, though the patient is currently on suspension secondary to medication mismatches at work . . ." (R. 183). During an emergency department visit on October 29, 2005, the ER doctor noted, "[p]resently the patient is still requesting medication for pain although he appears to be quite comfortable." (R. 219).  During his treatment for his overdose on February 1, 2007, the ER doctor noted that "I also feel there is an issue that he is being given as much narcotics as he is being given by his pain management physician," and that "[a]ll systems [are] negative except presently for the fact that he is even now seeking more pain medication for 'chronic back pain.'" (R. 499-500).  In short, there is substantial evidence of record to support the ALJ's "polysubstance abuse theory." Additionally, Dr. Sastry's opinion is subject to the same analysis advanced above with respect to Dr. Vega's opinion.

The Court concludes that substantial evidence supports the weight the ALJ assigned to the opinions of Dr. Vega and Dr. Sastry as expressed on the questionnaire forms.

Plaintiff briefly advances an argument that the ALJ's adverse credibility determination with respect to plaintiff's complaints of pain was erroneous.  The ALJ evaluated plaintiff's self-reported daily activities as being in contradistinction to plaintiff's claim of total disability.  These daily activities included attending classes at West Virginia University, , riding tractors, driving 80 miles per week, and socializing at the American Legion.  The ALJ also noted plaintiff's polysubstance abuse in making her credibility determination.  The Court finds that the ALJ's credibility determination is based upon substantial evidence and not unreasonable in light of these findings.   Moreover, the ALJ has authority to make credibility determinations. *Van Horn v.*

*Schweiker,* 717 F.2d 871, 873 (3d Cir. 1983).  "Because he had the opportunity observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989-90. (4th Cir. 1984). The ALJ's credibility determinations need only be supported by substantial evidence on the record.  Such determinations are entitled to deference. *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 271 (3d Cir. 2003).  Federal law limits the scope of a district court's ability to review a federal agency's administrative decisions.  The factfinder's credibility determination is "virtually unreviewable." *Hambsch v. U.S. Dep't of Treasury*, 796 F.2d 430, 436 (Fed. Cir. 1990).  The Court finds no error as to the ALJ's credibility determination with respect to plaintiff.

      Plaintiff's final argument is wholly dependent on his first two.  Plaintiff asserts that the ALJ failed to accurately identify plaintiff's limitations in posing hypothetical questions to the VE.  Plaintiff asserts that the ALJ should have included the limitations identified by Dr. Vega and Dr. Sastry on the medical questionnaires, and that the ALJ should have accounted for plaintiff's subjective complaints of pain in framing his hypothetical questions to the VE. Hypothetical questions to a vocational expert must accurately reflect all of a claimant's credibly established limitations. See *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).  As such, the ALJ may exclude limitations that are "reasonably discounted" by the evidence. *Rutherford*, 399 F.3d at 555.  Based on the analysis expounded above regarding the opinions of Dr. Vega and Dr. Sastry, as well as the ALJ's adverse credibility determination with respect to plaintiff, the Court finds that the ALJ's hypothetical questions to the VE properly encompassed all of plaintiff's impairments supported by objective medical evidence in the record and was not unreasonable.  The Court, therefore, is constrained to find that the ALJ's reliance on the VE's testimony to be likewise not unreasonable.

**VI.     CONCLUSION**

For all of the foregoing, the decision of the ALJ is affirmed, and the Commissioner's motion is granted. Plaintiff's motion is denied. An appropriate order shall issue.

s/ David Stewart Cercone<br>
David Stewart Cercone<br>
United States District Judge

cc:     Gregory T. Kunkel, Esquire
        Kunkel & Fink, LLP
        Brentwood Professional Building
        4411 Stilley Road, Suite 206
        Pittsburgh, Pennsylvania 15227
        *for the Plaintiff*

        Paul Kovac, Esquire
        Assistant U.S. Attorney
        Western District of Pennsylvania
        U.S. Post Office & Courthouse
        700 Grant Street, Suite 4000
        Pittsburgh, Pennsylvania 15219
        *for the Commissioner*